## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JOSEPH W. CROMP, SR.,

                          Plaintiff,

      v.                                      6:14-CV-1008
                                               (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
DANIEL R. JANES, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### MEMORANDUM-DECISION and ORDER

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and

N.D.N.Y. Local Rule 73.1, this matter was referred to me, with the consent of the

parties, for all proceedings and entry of a final judgment, by the Honorable Gary L.

Sharpe, Chief United States District Judge, by Order dated July 19, 2013 (Docket No.

11).

## I.   PROCEDURAL HISTORY

On, October 22, 2008, plaintiff protectively[1] filed an application for Disability

Insurance Benefits ("DIB"), alleging disability beginning October 11, 2008.

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. In this case the protective filing date of October 22, 2008 is listed on the Disability Determination and Transmittal, dated March 4, 2009. (T. 126).

(Administrative Transcript ("T") at 21, 126, 272-75). The application was denied initially on March 5, 2009. (T. 150-53). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was conducted by ALJ Thomas P. Tielens on April 13, 2010. (T. 94-125). ALJ Tielens issued an unfavorable decision on June 18, 2010. (T. 127-44). Plaintiff requested review by the Appeals Council, and on November 23, 2011, the Appeals Council remanded plaintiff's case for supplemental proceedings. (T. 145-49).

On September 24, 2012, ALJ F. Patrick Flanagan held a supplemental hearing[2] at which plaintiff and Vocational Expert ("VE") Don Schader appeared and testified. (T. 40-93). On January 18, 2013, ALJ Flanagan issued a decision finding that plaintiff was not disabled from his alleged date of onset, through the expiration of his insured period on December 31, 2011. (T. 18-39). ALJ Flanagan's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 9, 2014. (T. 5-10).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically

---

[2] ALJ Flanagan conducted the supplemental hearing because ALJ Tielens had retired. (T. 42-43).

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than

twelve months . . . ." 42 U.S.C. § 1382c(a) (3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the Commissioner next
> considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations.  If the claimant has such an impairment, the Commissioner
> will consider him [per se] disabled . . . . Assuming the claimant does not
> have a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform his
> past work, the Commissioner then determines whether there is other work
> which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520,

416.920.  The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff's counsel has included a statement of facts in his brief. (Pl.'s Br. at 2-7) (Dkt. No. 13). Defense counsel has incorporated plaintiff's statement of facts as well as the findings of the ALJ at pages 23-32 of the transcript, with some additional facts from the record. (Def.'s Br. at 3) (Dkt. No. 16). The court will adopt the facts stated in plaintiff's brief, together with the facts as stated by the ALJ, with any exceptions as noted in the discussion below. Rather than further detailing the medical evidence at the outset, relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV.   ALJ'S DECISION

After finding that plaintiff met his insured status until December 31, 2011, the ALJ found that plaintiff had not engaged in substantial gainful activity from his alleged

onset date until the date that he was last insured. (T. 23). At step two of the sequential analysis, the ALJ found that plaintiff had the following severe impairments – status post gunshot wound to the left hand, with ring-finger amputation and flexion contracture of the middle finger; asthma with chronic obstructive pulmonary disease ("COPD"); history of acute back strains; and post-traumatic stress disorder ("PTSD"). (T. 24). The ALJ found that although plaintiff had been "medically managed" for other impairments (obesity, gastroesophageal reflux disease ("GERD"), hypertension, and depression), none of these impairments were "severe" within the meaning of the regulations. (*Id.*)

At step three, the ALJ found that none of plaintiff's severe impairments met or equaled the severity of a Listed Impairment. (T. 25-27). The ALJ considered Listing 1.02(B)[3] due to plaintiff's hand injury.[4] However, the ALJ found that, while plaintiff had limitations with fine motor activities of his left hand, he could still oppose his thumb to his index and middle fingers. In addition, his hand and finger dexterity were "intact on the right side." (T. 25).

The ALJ also considered Listing 3.03, governing asthma. (T. 25-26). The ALJ

---

[3] Listing 1.02 requires the major disfunction of a joint due to any cause. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Subsection B requires the involvement of one major peripheral joint in "each" upper extremity, resulting in an inability to perform fine and gross movements effectively. *Id.* § 1.02(B)

[4] On October 11, 2008, plaintiff suffered a self-inflicted gunshot wound to the left hand which occurred when he was cleaning his gun. (T. 399-401). Plaintiff underwent surgery, performed by Dr. Michael P. Nancollas, M.D. (T. 400). The surgery included the amputation of his fourth digit. (*Id.*)

found that there was no evidence in the record showing that plaintiff experienced the requisite frequency of asthma attacks to satisfy the requirements of the Listing. (T. 25). The more recent consultative internal medicine examination by Dr. Kalyani Ganesh, M.D. also shows that recent pulmonary function testing resulted in no more than "moderate obstruction,"[5] and plaintiff's medications were achieving a "good response." (T. 26).

The ALJ considered Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) in conjunction with plaintiff's alleged mental impairments. (*Id.*) The ALJ considered whether the paragraph "B" criteria of the Listings were satisfied.[6] In order to meet either listing, the mental impairment must result in a "marked" restriction in at least two of the factors listed in the paragraph – activities of daily living; maintaining social functioning; maintaining concentration persistence and pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App.1 §§ 12.04(B), 12.06(B).

Relying on a consultative examination by psychologist, Dr. Kristen Barry, Ph.D., the ALJ found that plaintiff had no more than mild restrictions in his daily activities,

---

[5] While the ALJ noted that plaintiff was "reported as not cooperating fully," with Dr. Ganesh's test, the ALJ gave plaintiff the benefit of the doubt based on a 2009 report, indicating the possibility of "'severe obstructive defect with air trapping' but normal diffusion, and significantly reduced [Forced Expiratory Volume1]." (T. 26). Because of this 2009 finding, the ALJ stated that the pulmonary aspects of plaintiff's case were "carefully worked into the determined RFC." (*Id.*)

[6] Paragraph B is the same for both Listing 12.04 and Listing 12.06. Thus, if plaintiff does not meet the paragraph B criteria, he cannot meet the requirements of either listed impairment.

moderate limitations in social functioning, and mild restrictions in his ability to maintain concentration, persistence, and pace. (T. 26). Further, plaintiff had no extended episodes of decompensation. (T. 27). The ALJ also considered paragraph C of each listing, finding that plaintiff failed to meet the criteria. (*Id.*) Finally, the ALJ noted that because the paragraph B limitations rate only severity, but are not in themselves an RFC evaluation, the ALJ would include a more detailed functional assessment of plaintiff's mental RFC when discussing steps four and five of the disability analysis. (*Id.*)

At step four, the ALJ found that plaintiff had the RFC to perform the basic physical demands of light work, including the ability to lift/carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk about hours in an eight hour day; and push and pull the same amount of weight. (*Id.*) Plaintiff could reach overhead bilaterally frequently, but because of his left hand injury, could not grasp forcefully with his left hand. He can also only handle objects occasionally with his left hand. He can oppose the left thumb to the left index finger, but cannot do so forcefully. (*Id.*)

With respect to his asthma, plaintiff needs to use a respirator if he is more than occasionally exposed to dust, and he should avoid humidity as well as concentrated exposure to fumes and other known air-borne irritants. (*Id.*) To accommodate his mental limitations, plaintiff should not work with firearms, and he should not work at a job which requires negotiations or confrontation with others. (*Id.*) The ALJ found that

plaintiff maintained the ability to perform the basic mental demands of substantial gainful activity, including understanding, carrying out, and remembering simple instructions and directions; using appropriate judgment; regularly attending to a routine and maintaining a schedule; responding to supervision, co-workers, and work situations; and dealing with changes in a routine work setting. (*Id.*)

The ALJ gave "significant" weight to physical examination reports by consultative examiner Dr. George Alexis Sirotenko, D.O. and "great weight" to the more recent consultative report by Dr. Ganesh.[7] (T. 31). Both of these physicians examined plaintiff, and the ALJ noted that there were no other medical source statements in the record from any treating physicians that contradicted the consultative reports. (*Id.*) The ALJ gave great weight to Dr. Barry's psychological assessment. (T. 29). The ALJ gave little weight to non-examining agency physician S. Putcha, who found that plaintiff could do "one handed work." (*Id.*)

The ALJ considered plaintiff's symptoms, but found that he was only partially credible because the record did not support the extent of the limitations that he was claiming. (T. 28). In addition to lack of support from the clinical findings, the ALJ cited to plaintiff's daily activities. (T. 30). The ALJ noted numerous inconsistencies in the record, including evidence showing that during the period of his alleged disability,

---

[7] Dr. Sirotenko examined plaintiff in conjunction with his first ALJ hearing, and Dr. Ganesh examined plaintiff after the Appeals Council remand, in conjunction with his current hearing. ALJ Flanagan properly considered the entire record, including medical reports from before and after the Appeals Council remand.

he was lifting refrigerators and snowmobiles.  (*Id.*)  The plaintiff testified that he only suffered "occasional" flare-ups of back pain, that he could probably lift about 50 pounds, and could lift a gallon of milk 100 times in a row, although it would make him short of breath. (*Id.*)  With respect to the plaintiff's asthma, the ALJ cited treatment notes from Rome Medical Group, indicating that plaintiff's asthma flared up when he was not compliant with his medications. (*Id.*)

Further at step four, the ALJ found that plaintiff could not perform his past relevant work as a hardwood floor refinisher. (T. 31).  At step five, the ALJ consulted a VE who testified that based on the RFC above (which was included by the ALJ in a hypothetical question), plaintiff would be able to perform three jobs in the national economy – mail room clerk, ticket seller, and interviewer/survey worker.  Thus, the ALJ found that plaintiff was not disabled from his onset date to the date he was last insured on October 31, 2011. (T. 32).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ's RFC determination is not supported by substantial evidence. (Pl.'s Br. at 8-12).

2.    The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 13-15).

3.    The ALJ's step five determination is not supported by substantial evidence due to an incomplete and unsupported hypothetical question posed to the VE. (Pl.'s Br. at 15-16).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. For the following reasons, this court agrees with the defendant and will order that the Commissioner's decision be affirmed and the complaint be dismissed.

## VI.  RFC

### A.  Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460

(W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

Plaintiff argues that, in determining plaintiff's RFC, the ALJ failed to properly reconcile the medical opinions of Dr. Barry, Dr. Ganesh, and Dr. L. Meade[8] with the ultimate RFC. (Pl.'s Br. at 9-12). This court does not agree. In any event, when the evidence of record permits the court to glean the rationale in an ALJ's decision, he need not reconcile every piece of evidence or explain why he found it unpersuasive. *See Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. (2d Cir. 2013); *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011).

Plaintiff first claims that although the ALJ gave Dr. Barry's opinion great weight, the ALJ's RFC determination neglected to include Dr. Barry's findings that plaintiff had "limitations in cognitive functioning" and must "avoid stressors." (*Id.* at 10). As defendant points out, Dr. Barry did not include borderline intellectual functioning as a diagnosis. (T. 470). She stated in the narrative part of her report, that plaintiff's intellectual functioning was in the "borderline to low average range," and that his "[g]eneral fund of information appears appropriate to his experience." (T. 469). Citing Dr. Barry's report, ALJ found that plaintiff could follow and understand simple

---

[8] Dr. L. Meade is a non-examining "medical consultant." (T. 486-88). The record does not contain his or her full name or specific psychological or psychiatric specialty.

instructions and directions and maintain his attention and concentration. (T. 29). This would accommodate plaintiff's intellectual functioning.

Dr. Barry's diagnosis of PTSD appears to have been based on plaintiff's allegations of nightmares relating to his gunshot wound and the loss of his finger. (T. 468, 470). Plaintiff told Dr. Barry that he wakes up at night to the sound of gunshots, has nightmares about being shot, and keeps reliving the incident. (T. 468). In her diagnosis, Dr. Barry stated that plaintiff "may have *some difficulty at times* handling stressors."[9] (T. 470) (emphasis added). The ALJ cited plaintiff's issues with anger management, but noted that he finished anger management counseling in 2008 and was taking medications which helped control his anger.[10] (T. 29). The ALJ accommodated plaintiff's occasional inability to deal with stressors in the RFC by stating that plaintiff should not work "around or with firearms," nor should he work in jobs that require negotiation or that involve confrontation with others. (T. 27). These limitations

---

[9] Social Security Ruling ("SSR") 85-15 discusses the effect of various non-exertional impairments, including stress and mental illness on the ability to work. SSR 85-15, 1985 WL 56857 (1985). Stress at the workplace is discussed in terms of the ability to get to work on time and regularly, being supervised, and remaining at work for a full day, SSR 85-15 stat, at *6. Plaintiff is not significantly limited in the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance and be punctual. (T. 468 (Dr. Barry's report), 486 (non-examining medical consultant's statement of limitations)). He is not significantly limited in the ability to sustain an ordinary routine without special supervision. (*Id.*) In fact, Dr. Barry stated that he has been able to perform tasks independently. (T. 470). Thus, it appears that the plaintiff's main problem with stress involves the firearm restriction and his anger issues, not stress in meeting the demands of a job. SSR 85-15 states that the impairment-related limitations must be reflected in the RFC. *Id.* The ALJ's finding in his RFC that plaintiff should avoid firearms and not work in jobs involving negotiation or confrontation accommodates for plaintiff's shortcomings in those areas.

[10] On December 2, 2009, Dr. Matthew McKay, M.D., one of plaintiff's treating primary care physicians stated that plaintiff reported that Zoloft was "extremely effective" in treating his depression and his "short temper." (T. 526).

account for cognitive as well as anger or stress-based issues.[11]

Plaintiff also argues that the ALJ failed to account for details in Dr. Meade's evaluation. (Pl.'s Br. at 12). Plaintiff argues that the ALJ did not include Dr. Meade's assessment that plaintiff would have "moderate limitations in work and social situations." (*Id.*) The ALJ's RFC limited plaintiff to work which did not require "negotiations" or "confrontation with others." (T. 27). Plaintiff argues that the ALJ's RFC does not account for the "specific social limitations Dr. Meade opined to," nor is there any mention in the RFC of plaintiff's ability to follow simple instructions. (*Id.*)

Dr. Meade is a non-examining medical consultant, who completed a check-box mental RFC evaluation. (T. 486-88). The ALJ gave Dr. Meade's evaluation only "some weight" because Dr. Meade did not examine plaintiff. (T. 30). In any event, although plaintiff is correct that Dr. Meade found a "moderate limitation" in the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with co-workers without distracting them or exhibiting behavioral extremes, Dr. Meade also found that plaintiff was "not significantly limited" in the ability to interact appropriately with the general public, the ability to ask simple questions or

---

[11] The court also notes that the jobs cited by the VE all have an SVP of 2. (T. 88-89). The information in the Dictionary of Occupational Titles ("DOT") is available on the Occupational Information Network, known as O'NET. *Evans v. Commissioner of Soc. Sec.*, No. 14 Civ. 4093, 2015 WL 3885243, at *4 n.3 (S.D.N.Y. June 24, 2015) (citing O'NET). Specific Vocational Preparation ("SVP") is defined as the amount of time that it takes a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a job. *Id.* (citing https://www.onetonline.org/help/online/svp). An SVP of 2 corresponds to unskilled work. *Norman v. Astrue*, 912 F. Supp. 2d 33, 64 n.58 (S.D.N.Y. 2012) (citing 20 C.F.R. § 404.1568, 416.968; Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 at *3). Unskilled work needs "little or no judgment to do simple duties that can be leaned on the job in a short period of time." 20 C.F.R. § 404.1568(a). In determining that plaintiff can perform unskilled work, the ALJ accounted for any deficiency in his intellectual ability.

request assistance, and the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (T. 487). The ALJ's determination that plaintiff can do a job that does not involve negotiation or confrontation with others takes Dr. Meade's limitations into account.

Dr. Meade also stated that plaintiff was not significantly limited in his ability to remember locations and work procedures; understand, remember, and carry out very short and simple instructions, maintain attention, stay within a schedule, sustain a routine without special supervision, and "work in coordination with or proximity to others without being distracted by them." (T. 486). The ALJ also specifically stated in his opinion that he gave great weight to Dr. Barry's conclusion that plaintiff was "able to follow and understand simple instructions and directions and maintain his attention and concentration." (T. 29). There is no evidence in the record that contradicts this finding. In addition, as stated above, all three of the jobs mentioned by the VE are unskilled. Thus, the ALJ did not "fail" to reconcile Dr. Meade's opinion with the RFC that he used for his hypothetical question.

Plaintiff also argues that the ALJ failed to reconcile the limitations in Dr. Ganesh's report with the ultimate RFC finding. (Pl.'s Br. at 11). Plaintiff alleges that the ALJ did not provide for specific pushing, pulling, lifting or carrying limitations for plaintiff's left hand and failed to reconcile all the environmental limitations stated in the report.[12] Plaintiff argues that Dr. Ganesh's environmental limitation meant that plaintiff could "never" be exposed to extreme heat or cold and could never be exposed

---

[12] Plaintiff states that the ALJ did not account for the limitation on exposure to extreme heat or cold and plaintiff's inability to be exposed to respiratory irritants. (Pl.'s Br. at 11).

to any respiratory irritants, and that the RFC did not take this substantial restriction into account. (Pl.'s Br. at 11).

First, although Dr. Ganesh's "check-box" form has boxes checked under environmental restrictions that indicate that plaintiff can "never" tolerate dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat (T. 548), her narrative report states that plaintiff "[s]hould *avoid* known respiratory irritants." (T. 540) (emphasis added). SSR 85-15 states that where an individual can tolerate very little noise, dust "etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions." SSR 85-15, 1985 WL 56857, at *8 (1985). However, where the medical restriction is to "avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." *Id.* SSR 85-15 also states that where the restriction falls between very little and excessive, resolution of the issue will generally require a VE. *Id.*

In this case, the ALJ did consult a VE and accommodated plaintiff's environmental restriction in the RFC by stating that plaintiff needs to use a respirator "with more than occasional exposure to dust and should avoid concentrated exposure to fumes and other known air-borne irritants and to excessive humidity."[13] (T. 27). The

---

[13] Although not mentioned in the ALJ's decision, the transcript contains medical records from Cayuga Correctional Facility for the period of time that plaintiff was incarcerated. (T. 560-617). The records are dated from August 20, 2010 until July 28, 2011. (*Id.*) On October 5, 2010, plaintiff spoke to a nurse about obtaining a "program change." (T. 586). Plaintiff was working in "masonry," and the dust was aggravating his COPD. On November 9, 2010, plaintiff returned to the medical department to discuss the matter with a physician, who stated that plaintiff "may wear a mask while in masonry." (*Id.*) These reports indicate that plaintiff worked during his incarceration, and that the use of a mask was sufficient to accommodate the dusty environment. In any event, the jobs cited by the VE in this case

16

SSR cited by plaintiff does not include limitations on temperature extremes, but the court notes that none of the jobs mentioned by the VE would involve either extreme cold or extreme heat since they are all occupations performed indoors.[14]

The ALJ discussed plaintiff's hand injury in detail. (T. 28-29). Plaintiff's treating surgeon stated in a report dated December 3, 2008, that plaintiff's left hand pain was "essentially resolved." (T. 441). The ALJ cited plaintiff's first consultative examination by Dr. Sirotenko, who stated on December 13, 2008 that plaintiff was able to oppose his thumb to his index and middle finger. (T. 458). Plaintiff underwent hand therapy, and by February 2009, plaintiff's surgeon Dr. Michael P. Nancollas stated that plaintiff's range of motion had improved, with no significant pain. (T. 499). By March 2009, plaintiff's wounds had essentially stabilized. (T. 500).

The ALJ's RFC was quite specific regarding the RFC in plaintiff's left hand. (T. 27). The ALJ stated that plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, and is "able to push/pull those same basic weight limits."[15]

---

would not involve the amount of dust to which plaintiff would be exposed in a masonry job. On April 19, 2011, plaintiff had symptoms with "mild" effort and was wheezing, but his lungs were clear with expiratory wheezing. (T. 579). The asthma was categorized as "moderate persistent." (*Id.*) The facility had a "rescue plan" in place. (T. 562-63, On July 13, 2011, plaintiff's respiratory condition was termed "asymptomatic," and his asthma was categorized as "Mild Intermittent Asthma," and his lungs were clear to "P & A" (percussion and ascultation). (T. 575). On July 17, 2011, plaintiff's asthma was characterized as "moderate persistent." (T. 576). This is further support for the ALJ's determination that plaintiff has a severe impairment, but can work with the accommodations noted by the ALJ in his RFC evaluation.

[14] To the extent that failing to include temperature extremes in the RFC is an error, it would be harmless. *See Oakley v. Colvin*, No. 3:13-CV-679, 2015 WL 1097388, at *6-7 (N.D.N.Y. Mar. 11, 2015) (administrative error is harmless when the same result would have been reached had the error not occurred) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

[15] Plaintiff testified that he could lift 50 pounds. (T. 69-70). Plaintiff's attorney asked him a follow-up question about how he would "feel" after lifting 50 pounds, and plaintiff stated that he

However, the ALJ stated that plaintiff could not grip "forcefully" with his left hand and could only handle objects with the left hand "occasionally." (*Id.*) The ALJ also stated that plaintiff could oppose his left thumb to the left index finger, but not forcefully. Dr. Ganesh found that plaintiff had only a "mild" limitation lifting, carrying, pushing, and pulling with his left hand. (T. 540). Dr. Ganesh also found that plaintiff had intact hand and finger dexterity, and the grip strength in his left hand was 4/5. (T. 539). Dr. Ganesh noted that plaintiff was status post-amputation "however, he is able to use his hands quite freely to do all fine motor activity." (*Id.*) Thus, the ALJ properly weighed the medical evidence and included the information in his written decision and in his RFC. The ALJ's RFC determination is supported by substantial evidence in the record.

## VII. <u>CREDIBILITY</u>

### A. **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

---

would be "out of breath." Plaintiff did not question that he had the strength to lift the weight. (T. 79).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B. Application

Plaintiff argues that the ALJ did not properly consider plaintiff's credibility and that the ALJ improperly considered only the medical evidence as a basis for his decision. (Pl.'s Br. at 13). Plaintiff also argues that the evidence cited by the ALJ "does not adequately represent the record as a whole." (Pl.'s Br. at 14).

The ALJ clearly accepted that plaintiff had physical limitations when he found

plaintiff was limited to light work.  While the ALJ did state that the medical evidence did not support the extent of plaintiff's claimed limitations, the ALJ also discussed the numerous "inconsistencies in the record" which contradicted plaintiff's allegations of severe pain. (T. 30).  The ALJ noted that in July of 2012, plaintiff complained to his doctor that his back pain was worse after "trying to lift a refrigerator into a truck." (*Id.*) The ALJ quite correctly noted that such an activity, in itself "contradicts the ongoing claim of severe back pain." (*Id.*)  The court notes that this activity would also contradict plaintiff's claim that he was limited in the use of his left hand to push or pull.

The ALJ also found other references in the record to show that plaintiff was engaging in "significant physical activity." (T. 30).  Plaintiff was lifting a snowmobile and a pole.[16]  At his hearing, plaintiff testified that he could lift 50 pounds and that he was "very strong." (T. 69).   Plaintiff stated that his main complaint was his asthma, not his hand or his strength. (T. 50-51).  The ALJ also noted that "despite his testimony that taking walks triggers his asthma, his doctor repeatedly advised him to increase his activity levels,"[17] and that the medication side effects that he claimed at the hearing

---

[16] There are various medical reports from plaintiff's treating physicians and other medical providers, indicating that plaintiff was engaging in activities that would contradict his claims of disabling pain. (*See e.g.* T. 526 - 12/2/09 (plaintiff complained of pain after moving heavy objects, including a snowmobile); 525 - 2/10/10 (plaintiff told treating provider that he was taking classes to drive a tractor trailer and breathing issues affected his concentration); 519 - 12/07/11 (plaintiff told Dr. McKay that his back pain was worse because he fell off a ladder); 514 - 4/8/10 (plaintiff hurt his low back while attempting to lift a pole); 510 - 7/3/12 (plaintiff reported "renewed" back pain after lifting a refrigerator onto the back of a truck); 507 - 8/29/12 (plaintiff developed rash after swimming in the creek); 504 - 9/13/12 (Dr. McKay reported that plaintiff had been seen by Dr. Quinn "recently" after an ATV accident)).

[17] One of his treating physicians, Dr. Matthew J. McKay from Oneida Medical Associates, told plaintiff on various occasions that he should increase his physical activity or continue with regular physical activity. (T. 532/534 - 9/10/09; 529 - 10/14/09 (discussed the importance of physical activity); 524 - 2/25/10 (continue with physical activity); 515 - 4/8/10 (increase physical activity)).

were never mentioned to any physicians. (T. 30). In fact, plaintiff reported to his treating primary care providers that he was doing "quite well" on his asthma and COPD medications, and reported that the Zoloft "works great" for his depression and "short temper."[18] (T. 504, 526, 541).

In finding that plaintiff's claim of "more significant" functional limitations was not supported by the record, the ALJ stated that plaintiff could still oppose his left thumb to his index and middle fingers, and that he has "intact" hand and finger dexterity in his right hand, "which is also his dominant hand." (T. 28). Plaintiff argues that the ALJ is incorrect in this statement, that plaintiff testified that he was ambidextrous, but that he used his *left* hand before the accident. (Pl.'s Br. at 14). Plaintiff cited Dr. Ganesh's report which stated that plaintiff "is left-handed." (T. 537). Plaintiff also cites his treating surgeon for the proposition that he cannot oppose his fingers.

The court would first point out that Dr. Ganesh was only repeating plaintiff's statement that he was "left-handed." In his post-operative report, Dr. Nancollas, stated that "[o]f note, the patient is *right* hand dominant." (T. 400) (emphasis added). At the hearing, plaintiff testified that he was ambidextrous,[19] but before the accident he mostly used his left hand. (T. 46). Based on the conflict in the record, the ALJ was entitled to discredit plaintiff's claim that he mostly used his left hand before the accident.

---

[18] The records indicate that plaintiff had one side effect from the Zoloft that was unrelated to his ability to work and which was successfully treated with another medication. (T. 514-15).

[19] On October 1, 2012, plaintiff was referred to orthopedic specialist, Dr. Stephen Robinson of Syracuse Orthopedic Specialists for his back. (T. 551-54). Dr. Robinson's report states that plaintiff is "ambidextrous." (T. 552).

While in March of 2009, Dr. Nancollas did note that plaintiff had "limited use of his middle finger" and discussed the possibility of another surgery,[20] in 2012, Dr. Ganesh stated that plaintiff "is able to use his ***hands*** quite freely to do all fine motor activity." (T. 539). Plaintiff himself testified that he could oppose his thumb to his index finger and that "I can still function."[21] (T. 63). Plaintiff's grip strength was 5/5 on the right and 4/5 on the left. (*Id.*) Thus, the ALJ did not misstate or misinterpret the record when determining that plaintiff was right handed and that he could oppose his remaining fingers.[22] The ALJ was simply resolving conflicts in the record. Contrary to plaintiff's argument, the ALJ discussed the reasons for rejecting his credibility in detail, including medical evidence, daily activities, and medication side effects. The ALJ's reasoning is supported by substantial evidence in the record.

## VIII. <u>VOCATIONAL EXPERT</u>

### A.    **Legal Standards**

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ

---

[20] Plaintiff argues that Dr. Nancollas "recommended" another surgery. (T. 500). However, Dr. Nancollas stated that he told plaintiff that another surgery "could be performed," not that he recommended it. In fact, Dr. Nancollas said that "I warned him that he may get partial but not complete relief of his symptoms. The patient understands these issues and wishes to proceed with the surgery." (*Id.*) No further surgery was performed.

[21] While plaintiff also stated that he dropped coffee cups with his left hand, the ALJ discredited the extent of plaintiff's claimed limitations.

[22] The ALJ considered the limitation in plaintiff's left hand when he asked the VE his hypothetical question, including the limitations on gripping with his left hand.

carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id.* at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

## B.    Application

Plaintiff argues that the VE's testimony is not supported by substantial evidence

because the ALJ's hypothetical question was "incomplete" and "unsupported." (Pl.'s Br. at 15-16).  This argument is based on plaintiff's argument that the ALJ's RFC evaluation did not contain sufficient limitations as argued above.  Because this court has found that the ALJ's RFC evaluation was supported by substantial evidence, then the hypothetical question posed to the VE is equally supported, and the court need not analyze it any further.

　　　　**WHEREFORE**, based on the findings above, it is

　　　　**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

　　　　**ORDERED**, that judgment be entered for the **DEFENDANT**.

Dated: July 14, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge